UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM T. TUCKER,<br><br>Petitioner,<br><br>v.<br><br>MATTHEW CATE, Secretary,<br><br>Respondents. | Civil No.    10-CV-2272-BGS<br><br>**ORDER:<br>(1) DENYING PETITION FOR WRIT OF<br>HABEAS CORPUS;<br>(2) DENYING REQUEST FOR<br>EVIDENTIARY HEARING; AND<br>(3) DENYING CERTIFICATE OF<br>APPEALABILITY** |

## I. INTRODUCTION

William Tucker ("Petitioner"), a state prisoner, has filed a First Amended Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. Petitioner challenges his convictions of attempted first degree murder (Cal. Penal Code §§ 664/187(a); 189) and assault with a deadly weapon (Cal. Penal Code § 245(a)(2)), with firearm enhancements (Cal. Penal Code, §§ 12022.5(a) & 12022.53(b-d)). In his Petition he contends: (1) insufficient evidence supports his attempted murder and assault convictions; (2) even if he was the shooter, the evidence was insufficient to support the attempted first degree murder conviction; (3) the trial court erred in finding an implied waiver following the abbreviated *Miranda* advisement in violation of his Fifth and Fourteenth Amendment rights; (4) Petitioner received ineffective assistance of counsel when trial counsel failed to hold the prosecution case to adversarial testing; and (5) his Sixth Amendment rights to effective assistance of counsel were violated when trial counsel failed to obtain evidence in support of the defense case. (Doc. No. 4.)

1

1    The parties consented to the jurisdiction of Magistrate Judge Skomal pursuant to 28 U.S.C. § 636(c)

2    and Fed. R. Civ. P. 73.  (*See* Doc. No. 4 at 11; Doc. No. 13.)  This Court has considered the Petition,

3    Respondent's Answer, Petitioner's Traverse, and all the supporting documents submitted by the parties.

4    Based on the documents and evidence presented in this case, and for the reasons set forth below, the Court

5    **DENIES** the Petition.

6                                    **II.  FACTUAL BACKGROUND**

7         This Court gives deference to state court findings of fact and presumes them to be correct.  Petitioner

8    may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C. §

9    2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including

10   inferences properly drawn from such facts are entitled to statutory presumption of correctness).  The facts

11   as found by the California Court of Appeal, Fourth District, Division One on Plaintiff's direct appeal are

12   as follows:

13        A. The People's Case

14             At around 7:46 p.m. on October 3, 2005, the shooting victim in this case, Jerry
15        Wright Jr. (Wright), was sitting on the stairs near his apartment in the Bay Vista Apartment
          complex on Logan Avenue in San Diego.  The Lincoln Park street gang claimed Lincoln
16        Park–the area where the Bay Vista Apartments are located in southeastern San Diego
          [footnote omitted] as their territory, and many members of that gang lived in that apartment
17        complex.  Although the Lincoln Park and O'Farrell gang were both affiliated with the
          Bloods, they had been rivals for over a decade.
18             Although Wright did not claim membership in any street gang, his brother had been
          a member of the O'Farrell Park gang. [footnote omitted] Tucker is a documented member
19        of the Lincoln Park gang, and his gang moniker was "Finny Boy."
               During the evening in question, as he was sitting on the stairs, Wright saw a group
20        of seven or eight males standing nearby, and he heard someone in the group say something
          about "cleaning up the set."  In the area where Wright lived, gangs were sometimes referred
21        to as "sets," and Wright understood the phrase "cleaning up the set" to mean cleaning up
          Lincoln Park.
22             Tucker was one of the males in the group.  Wright recognized him because he had
          seen Tucker near the apartment complex on previous occasions and had also seen him at the
23        complex earlier in the day.  Wright went to the basketball courts at the apartment complex.
          After he saw the group of males disburse, Wright decided to go back home.
24             As he was walking up the stairs leading to his apartment, Tucker approached him
          quickly from a dark "backside" area near the stairs and asked Wright for a "swisher," which
25        is a cigar.  Tucker was wearing a black hooded sweatshirt and a black beanie on his head.
               As he continued to walk up the stairs, Wright heard a noise and saw a male he knew
26        as "Hankie"–identified at trial as Scott by Scott's girlfriend–who was falling and stumbling,
          and making noise because he hit a gate.  Scott was wearing a black hooded sweatshirt and
27        a green bandanna over the lower portion of his fact, "Ninja style" with just the eyes showing.
          Scott, whom Wright had also seen on prior occasions, was one of the males Wright had seen
28        in the group earlier that evening.  Scott was stooped over behind Tucker and making
          "trembling" noises.  He had shot himself in the upper buttocks and down through his front
          left leg in the groin area.

Wright, who was on the fifth or sixth stair, jumped down off the stairs and started to run because what was happening was "too much commotion" for him, and he felt that Tucker was "trying to get" him. Wright did not look at Tucker as he turned to run. As Wright was running in front of Tucker, who was at most a few steps away, Wright heard a "pow" noise and a bullet hit him in the back. As he continued to run a second bullet hit him in the right arm. Wright ran through the basketball courts and out to the street where he passed out. At the hospital, Wright told his father that "Finny Boy"–Tucker–shot him. At trial Wright denied telling San Diego Police Department Detective Johnny Keene that he saw Tucker pointing a gun at him.

Detective Richard King, a City of San Diego police officer, testified that on October 3, 2005, he was on duty patrolling near the Bay Vista Apartments. He received a radio call reporting that shots had been fired at around 8:10 p.m. While en route to the Bay Vista Apartments he received information on the radio that the shooting victim could not be found. Because he had worked in the area for a long time, he knew that shooting victims often went to Paradise Hospital. Detective King drove to the hospital and learned that the shooting victim, Wright, had arrived moments before he arrived.

Detective King contacted Wright, who was on a gurney, conscious, and wearing an oxygen mask. Wright told him that he was shot by two men near his apartment in the Bay Vista Apartments. He said he had been going toward his apartment when a black male asked him for a swisher. Wright said he looked at the male and then saw another male come up. Wright saw that each male had a gun in his waistband, and they were pulling out the guns. He turned to run, heard a shot, felt pain in his back and in his arm, and ran out toward Logan Avenue. Wright told Detective King he thought he had previously seen them around the complex and would recognize them if he saw them again.

Detective Keene, who was assigned to the Street Gang Unit of the San Diego Police Department, testified that he interviewed Wright at the hospital on October 4, 2005, and he was accompanied by another detective. Wright was in some pain, but resting comfortably, and was alert and able to speak without slurring his words. Wright told Detective Keene that on October 3, as he was sitting on the steps that lead up to his apartment door, he saw a group of Lincoln Park gang members and overhead (sic) them talking about needing to clean up Lincoln and make it more Lincoln. Wright said he thought to himself that they were talking about him, but he did not think any drastic steps would be taken.

Wright told Detective Keene that after he went to the basketball courts, when he was six or seven steps up the stairs to his apartment, a male came toward him from under the stairs and asked him for a swisher. Wright then saw a second male coming toward him from behind the first male, and the second male was wearing a green bandanna over the lower portion of his face. Wright realized something was about to happen and, rather than run up the stairs and bring problems to his mother's apartment, he turned and ran down the stairs in an attempt to get away. As he did so, he heard gun shots and felt pain in both his back and right arm, ran through the basketball court and collapsed on Logan Avenue.

Wright also told Detective Keene that when he first saw the second male wearing the bandana, he looked back at the first male and saw the first male raising a gun in his direction. This was the moment when he turned and ran. Before he interviewed Wright, Detective Keene was informed that the shooter's nickname was Finny Boy, but he did not discuss with Wright the name of any person suspected of being involved in the shooting.

Detective Keene brought two separate photo line-ups to the hospital to show to Wright. The first photo line-up contained a picture of Tucker. After Wright gave his statement, Detective Keene gave a photo line-up admonishment to Wright and then showed him the first photo line-up. Wright viewed the line-up, pointed to the photograph of Tucker, and said that he had seen him around the Bay Vista Apartments, and that he (Tucker) could have been involved in the shooting.

Detective Keene then showed Wright the second photo line-up, in which there was a photograph of Scott. Wright viewed the line-up, pointed to the photograph of Scott, and said that he knew Scott, that Scott was a Lincoln Park gang member, and that he had seen Scott around the Bay Vista Apartments. Wright also told Detective Keene that the second suspect had a green bandanna covering the lower portion of his face, and that Scott could be

3

the second suspect, but he could not be sure.

Detective Keene returned to the hospital a couple of days later on October 6 to interview Wright again because Wright appeared to go right to the photographs of the two people that Keene thought were the suspects, and he wanted to ask Wright whether he was afraid. Wright repeated his account of what happened.

### B. The Defense

Tucker's grandfather, Tinny Tucker, testified he was at home "kind of late" on a Monday night, and Tucker was with him. He stated it was on October 3, 2005, but "maybe it's another date." He helped Tucker work on Tucker's car. Later that night he and Tucker went into the house and Tucker watched a football game on television. He had never seen Tucker wear a black "hoodie" sweatshirt.

Tucker's brother, Leonard Ingram, stated that on October 3, 2005, Tucker was at home watching a football game on television. He saw Tucker leave in the evening with Jeanine Hamilton.

Tucker's friend, Jeanine Hamilton, stated she and Tucker left his house and went to Wal-Mart at round 9:30 p.m. She identified herself and Tucker in a Wal-Mart surveillance video that was dated October 3, 2005, and time stamped 9:30pm. A receipt from Wal-Mart indicated they left the store at around 9:52 p.m.

Tucker's grandmother, Elizabeth Sabathia, testified that Tucker called her on October 3, 2005, at around 8:30 p.m. or earlier.

(Lodgment 7 at 2-4.)

## III. PROCEDURAL BACKGROUND

On March 15, 2006 a Superior Court of the State of California, County of San Diego jury found Petitioner guilty of assault with a firearm in violation of California Penal Code section 245(a)(2) with a firearm enhancement in violation of California Penal Code section 12022.5(a). (Lodgment 1 at 76.) The jury also found Petitioner guilty of attempted murder in violation California Penal Code sections 664 & 187(a) with firearm enhancements in violation California Penal Code section 12022.53(b-d). (Lodgment 1 at 77.) On March 21, 2006, Petitioner with the assistance of counsel, waived his right to a trial and entered an admission on his first prison prior pursuant to California Penal Code sections 667.5(b) and 668; his first serious felony prior pursuant to California Penal Code sections 667(a)(1), 668, and 1192.7(c); and his one strike prior pursuant to California Penal Code sections 667(b) thru (i), 1170.12, and 668. (Lodgment 1 at 235-36.) On November 8, 2006, the superior court sentenced Petitioner to state prison for life with the possibility of parole, plus 25 years to life plus a consecutive five years. (Lodgment 1 at 241-42.)

On July 26, 2007 Petitioner filed a direct appeal in the California Court of Appeal. (Lodgment No. 4.) Petitioner contended (1) the evidence was insufficient to support the attempted first degree murder and assault convictions and gun use enhancement because the only evidence linking him to the shooting was the victim's hunch or "common sense" suggesting Petitioner was the shooter; (2) even if Petitioner was the

shooter, the evidence was insufficient to support his conviction for attempted first degree murder; (3) the trial court erred in finding an implied waiver of his rights following an abbreviated *Miranda* advisement; and (4) the failure of the prosecutor to offer, or the court to grant, use immunity to a witness who invoked his Fifth Amendment rights violated Petitioner's rights to present a defense and to have a fair trial.  On April 24, 2008, in an unpublished opinion, the court of appeal affirmed the judgment of the trial court.  (Lodgment 7.)

On May 30, 2008 Petitioner filed a petition for review with the California Supreme Court. (Lodgment 8.)  This petition raised the same four grounds for relief presented at the California Court of Appeal.  (*Id.*)  On July 23, 2008, the California Supreme Court denied the petition for review.  (Lodgment 9.)

On January 13, 2009 Petitioner filed a state habeas corpus petition in the San Diego County Superior Court.  (Lodgment 10.)  Petitioner contended (1) he received ineffective assistance of counsel because the trial attorney failed to hold a critical portion of the prosecution's case to adversarial testing and (2) his Sixth Amendment rights to effective assistance of counsel were violated when his trial attorney failed to obtain evidence in support of his defense case.  (*Id.*)  On March 10, 2009, the San Diego Superior Court denied the petition for writ of habeas corpus.  (Lodgment 11.)  On April 9, 2008, Petitioner filed a Motion for Rehearing of Writ of Habeas Corpus in the San Diego Superior Court.  (Lodgment 12.)  On May 11, 2009, that court denied the motion.  (Lodgment 13.)

On June 9, 2009, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  (Lodgment 14.)  Petitioner raised the same two grounds for relief that he did at the at the San Diego Superior Court.  (*Id.*)  On September 30, 2009, the court of appeal denied the petition with a written opinion. (Lodgment  15.)

On November 17, 2009, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (Lodgment 16.)  Petitioner raised the same two grounds for relief that he did at the San Diego Superior Court and the California Court of Appeal.  (Lodgment 16).  On June 9, 2010, the petition was denied without comment.  (Lodgment  17.)

The instant Petition was filed November 3, 2010.  (Doc. No. 1.)  Respondent answered on February 14, 2011.  ( Doc. No. 10.)  Petitioner filed a traverse on June 21, 2011.  (Doc. No. 23.)  On July 13, 2011,

1  Petitioner filed a supplemental traverse on his fifth ground for relief in the instant Petition.  (Doc. No. 25.)

2  **IV.  PETITIONER'S CLAIMS**

3  Petitioner contends: (1) insufficient evidence supports his attempted murder and assault convictions;

4  (2) even if he was the shooter, the evidence was insufficient to support the attempted first degree murder

5  conviction; (3) the trial court erred in finding an implied waiver following the abbreviated *Miranda*

6  advisement in violation of his Fifth and Fourteenth Amendment rights; (4) Petitioner received ineffective

7  assistance of counsel when trial counsel failed to hold the prosecution case to adversarial testing; (5) his

8  Sixth Amendment rights to effective assistance of counsel were violated when trial counsel failed to obtain

9  evidence in support of the defense case. (Doc. No. 4.)

10  **V. STANDARD OF REVIEW**

11  Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas

12  corpus claims:

13  The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an
application for a writ of habeas corpus in behalf of a person in custody pursuant to the
14  judgment of a State court only on the ground that he is in custody in *violation of the
Constitution or laws or treaties of the United States.*
15

28 U.S.C. § 2254(a) (emphasis added).
16

17  The current Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996

18  ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  As amended, 28 U.S.C. § 2254(d) reads:

19  (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to
the judgment of a State court shall not be granted with respect to any claim that was
*adjudicated on the merits* in State court proceedings unless the adjudication of the claim –
20

21  (1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme
Court of the United States; or
22

23  (2) resulted in a decision that was based on an unreasonable determination
of the facts in light of the evidence presented in the State court proceeding.

24  28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

25  To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2).  *See*

26  *Williams v. Taylor*, 529 U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) as follows:

27  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court
arrives at a conclusion opposite to that reached by this Court on a question of law or if the
28  state court decides a case differently than this Court has on a set of materially indistinguish-
able facts.  Under the "unreasonable application" clause, a federal habeas court may grant

10cv2272BGS

1      the writ if the state court identifies the correct governing legal principle from this Court's

2      decisions but unreasonably applies that principle to the facts of the prisoner's case.

3 *Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

4      The Supreme Court further stressed that "an unreasonable application of federal law is different from

5 an *incorrect* application of federal law." *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011) (citing *Williams*,

6 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes

7 federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

8 decision." *Id*. at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 653, 664 (2004). Further, the more general

9 the rule, the more leeway courts have in reading outcomes in case-by-case determinations. *Id.*

10      Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision

11 was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)

12 (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual

13 grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."

14 *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th

15 Cir. 2004). In considering a challenge under 2254(d)(2), state court factual determinations are presumed to

16 be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing

17 evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual

18 findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I*,

19 537 U.S. at 341-42. ("The clear and convincing evidence standard is found in § 2254(e)(1), but that

20 subsection pertains only to state-court determinations of factual issues, rather than decisions.").

21      Where there is no reasoned decision from the state's highest court, the Court "looks through" to the

22 underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). Determining

23 whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require

24 that there be an opinion from the state court explaining the state court's reasoning." *Richter*, 131 S.Ct. 770,

25 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden

26 still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.*

27 **VI. DISCUSSION**

28      Here, as stated above, the California Court of Appeal adjudicated Petitioner's claims in grounds one,

two, and three on their merits in a reasoned decision on direct appeal, and the California Supreme Court summarily denied discretionary review.  (Lodgment 11.)  Further, the California Court of Appeal rejected Petitioner's claims in grounds four and five in a reasoned decision when it denied his petition for writ of habeas corpus based on his contention that he received ineffective assistance of counsel at trial.  (Lodgment 15.)  Thus, for purposes of AEDPA review, this Court will look to these two decisions.  *Ylst*, 501 U.S. at 801-06.

**A.    Ground One – Sufficiency of the Evidence: Identity of Shooter**

Petitioner asserts in his first ground for relief that insufficient evidence supports his attempted murder and assault convictions because the evidence was insufficient to establish that Petitioner fired the shots which struck Mr. Wright in the back and arm.  (Doc. No. 4 at 6.)  In support, he states that Wright says he did not see the shooter and no witness claimed to have seen Petitioner with a gun.  (*Id.*)

Respondent contends that ground one does not present a federal question because Petitioner does not assert any federal constitutional violation nor does he cite any federal authority.  (Doc. No. 10-1 at 16.) In the alternative, Respondent argues that to the extent Petitioner states a federal claim, the state court's adjudication was not unreasonable within the meaning of § 2254(d).

Petitioner does not specifically assert any federal constitutional right nor cite federal authority in his Petition.  However, in his Traverse Petitioner does argue that his right to due process was violated. Therefore, in liberally construing a pro se petitioner's pleading, the court will analyze ground one as though Petitioner alleged his federal due process rights were violated.

**1. Legal Standard –Sufficiency of the Evidence**

Petitioner's claim of insufficiency of the evidence was denied by the California Supreme Court without comment and therefore this Court looks through to the decision on the merits by the California Court of Appeal.  *Ylst*, 501 U.S. at 801-06.  Under AEDPA's highly deferential standard of review, this Court evaluates the court of appeal's decision to see if the decision was contrary to or an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1); *Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005) (applying 28 U.S.C. § 2254(d)(1) to federal habeas review of state court's determination of a sufficiency of the evidence claim).

On federal habeas review of an insufficient evidence claim previously adjudicated by a state court,

the applicable clearly established Supreme Court law for purposes of AEDPA review is the standard articulated in *Jackson v. Virginia*. *McDaniel v. Brown*, 130 S.Ct. 665, 673 (2010). Under *Jackson*, a conviction is not supported by sufficient evidence "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (emphasis in original). The *Jackson* standard does not require a federal court on habeas review to decide whether it would have found the trial evidence sufficient. *Id.* at 318-19. Nor does it require a federal court on habeas review to scrutinize "the reasoning process actually used by the fact-finder." *Id.* at 319 n. 13. Instead, a federal court on habeas review faced with a sufficiency-of-the-evidence claim must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original); *see also Wright v. West*, 505 U.S. 277, 284 (1992).

A federal court on habeas review faced with a factual record "that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. *Id.* at 326. "Moreover, circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992).

Furthermore, AEDPA requires a federal court to apply the *Jackson* standard with an additional layer of deference. *Juan H.*, 408 F.3d at 1274 (9th Cir. 2005). The issue this Court must address is whether the decision of the California court "reflected an 'unreasonable application of *Jackson*" to the facts of the case. *Id.* at 1274–75; *Ngo v. Giurbino*, 651 F.3d 1112, 1115 (9th Cir. 2011). To warrant federal habeas relief, the state court's application of *Jackson* must be "objectively unreasonable." *Cavazos v. Smith*, —— U.S. ——, ——, 132 S.Ct. 2, 4 (2011) (per curiam); *Juan H.*, 408 F.3d at 1275 n. 13.

**2. Court of Appeal Opinion**

Petitioner's claim of insufficient evidence was considered and rejected by the state court of appeal on direct review. (Lodgment 7 at 8-15.) The court of appeal first articulated the legal standard for its review of the insufficiency claim as follows:

> In determining the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

10cv2272BGS

of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319, italics omitted.)   "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence–that is, evidence which is reasonable, credible, and of solid value–such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578 (*Johnson*).)

The same standard of reviews applies in cases in which the People mainly rely on circumstantial evidence.  (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)  "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]' [Citation.] "'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'" [Citation.]"  (*Id.* at pp. 792-793).

A jury may reasonably rely on the testimony of a single witness, unless the testimony is physically impossible or patently false.  (Evid. Code, § 411; *People v. Cudjo* (1993) 6 Cal.4th 485, 608.)  We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.)

(Lodgment 7 at 8-9.)

The court of appeal then construed Petitioner's insufficiency claim as follows:

Tucker maintains the evidence was insufficient to prove he fired the shots that struck Wright in the back and arm.  He relies on Wright's trial testimony that he did not look at Tucker when he (Wright) turned around to run away, that he did not know whether Tucker had pointed a gun at him.  Tucker also relies on Wright's testimony in response to the prosecutor's request on redirect examination for an explanation of the basis of Wright's belief that Tucker shot him.  Wright testified that the basis of his belief was "'[c]ommon sense.  I got a lot of it and that's what it is.'"  Tucker also asserts that no other witness claimed to have seem him with a gun, and according to Wright's testimony "it would have been virtually impossible for [Tucker] to have run down the stairs, receive the gun from Scott and use it to shoot Wright in the time frame he described."

(Lodgment 7 at 10.)

The relevant element of the offense in question was whether petitioner fired the shots that struck Wright in the back and arm.  The court of appeal reviewed the record and found sufficient evidence as to this element.  The court of appeal identified the evidence on which a rational juror, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that Petitioner fired the shot that struck Wright:

The record, however, contains substantial evidence from which a reasonable trier of

fact could find beyond a reasonable doubt that Tucker was the shooter, and we reject Tucker's contention that the only evidence linking him to the shooting was Wright's hunch or "'common sense'" that Tucker was the shooter. Wright testified that at around 7:46 p.m. on the night of the shooting, as he was sitting on the stairs near his apartment, he saw a group of males standing nearby and heard someone in the group say something about "cleaning up the set." Wright understood the phrase "cleaning up the set" to mean cleaning up Lincoln Park. Wright indicated that the Lincoln Park street gang claimed Lincoln Park–the area in which the apartment complex was located as their territory. He also testified that his brother had been a member of the rival O'Farrell Park gang.

The defense stipulated that Tucker was a documented member of the Lincoln Park gang, Scott's girlfriend and Detective Keene both testified that Tucker's gang moniker was "Finny Boy." Wright testified he recognized both Tucker and Scott among the males in the group who discussed "cleaning up the set."

Detecive King's testimony established that the shooting occurred at around 8:10 p.m. on October 3, 2005. Wright testified that as he was walking up the stairs leading to his apartment, Tucker approached him quickly from a dark area near the stairs and asked Wright for a swisher (cigar). Wright then heard a noise and saw a male he knew as "Hankie," [footnote omitted] who was falling and stumbling, and making noise because he hit a gate. Scott's girlfriend testified that "Hankie" is Scott's nickname. Wright saw that Scott was stooped over behind Tucker. It is undisputed that Scott had just shot himself in the upper buttocks.

Wright indicated he immediately jumped down off the stairs and started to run because he felt Tucker was trying to "get" him. Wright also testified that as he ran in front of Tucker, who was only a few steps away, he heard a "pow" noise and felt a bullet hit him in the back. A second bullet hit him in the right arm as he continued to run.

Wright testified he told his father at the hospital that "Finny Boy"–Tucker–shot him. Officer John Cortez corroborated this testimony, stating that as he was standing at the crime scene a little after midnight, Wright's father approached him and said that he had just returned from seeing his son at the hospital, and that his son told him Finny Boy was the one who shot him.

Tucker's contention that it would have been impossible for him "to have run down the stairs, receive the gun from Scott and use it to shoot Wright in the time frame he described" is unavailing. There was no evidence to show that Tucker was on the stairs, and substantial evidence shows that he carried a gun that he used to shoot Wright. Specifically, Detective King testified that when he contacted Wright at the hospital, Wright told him that he was shot near his apartment in the Bay Vista Apartments. Wright told the detective that he had been going toward his apartment when a black male asked him for a swisher. Wright said he looked at the male and then saw another male come up. Wright also told the detective that he turned to run when he saw each male pull a gun from his waistband, and that he heard a shot, felt pain in his back and in his arm, and ran out toward Logan Avenue. Detective Keene's testimony also shows that Tucker was armed with a gun. Detective Keene indicated that during his first interview with Wright at the hospital, Wright told him that when he first saw the second male who was wearing the bandana (Scott), he looked back at the first male (Tucker) and saw that he was raising a gun in his direction.

Detective Keene's testimony does indicate that when he presented to Wright during that first hospital interview the photographic line-up containing a photograph of Tucker, Wright pointed to Tucker's photograph but did not identify Tucker as the shooter. Wright told Detective Keene that that (sic) he has seen the man around the Bay Vista Apartments, and that he could have been involved in the shooting. Detective Keene, however, stated that he returned to the hospital on October 6 to interview Wright again because be wanted to ask Wright whether he was afraid. Specifically, Detective Keene testified that he felt Wright knew who had shot him but he was not identifying anyone because of fear. During the second interview, Wright told Detective Keene he did fear retaliation because his family

grew up in a rival gang area, his brother and father had associated with a gang that was a rival to the Lincoln Park gang, and he feared for the safety of his mother, who lived in the Bay Vista Apartments where the shooting took place.

Wright's father testified that gangs frequently retaliate against people who "come forward." Wright's mother testified that she moved away from the Bay Vista Apartments because she received a phone call from a male who threatened that "if these guys get sentenced or whatever something was going to happen to [her] and [her] husband." Detective King testified, based on his expert experience as an officer in high-crime gang areas, that in gang areas witnesses commonly describe a crime but then stop short of telling the police who did it because of fear of retaliation. San Diego Police Department Detective Bruce Pendleton also testified, based on his more than three years of experience with the street gang unit, that it is really difficult to investigate a gang-related case because "witnesses are reluctant to come into court to get on the stand and point out a person who might be a member of the gang because they're afraid of what the . . .gang will do to them or their family members."

In sum, the jury did hear Wright testify that he did not know whether Tucker had anything in his hand when he (Wright) turned to run immediately prior to the shooting, and that he did not tell Detective Keene that Tucker had pointed a gun at him. The jury also heard Wright's father testify that when he went to the hospital to see his son, he did not speak with Wright, and he did not tell Officer Cortez that Wright told him Finny Boy was the person who shot him. However, the jury heard Wright's testimony indicating that Tucker, who the defense stipulated was a member of the Lincoln Park gang, and Scott were in the group of males who he overheard discussing something about "cleaning up the set," which to him meant cleaning up Lincoln Park. The jury also heard Wright's father and mother, Detective King and Detective Pendleton testify about the reluctance of witnesses in gang-related cases to identify those who have committed crimes because of their fear of retaliation. The jury heard Officer Cortez's testimony that Wright's father told him at the crime scene that Wright had told him at the hospital that each of the two men who approached him at the Bay Vista Apartments pulled a gun from his waistband; and Detective Keene's testimony showing that Wright told him at the hospital that the first male he saw–Tucker–raised a gun in his direction. In addition, the jury heard testimony that Scott had shot himself in the buttocks and was in a stooped position immediately before Wright was shot; that Wright was only a few steps away from Tucker when he was shot; and that Wright, who had selected the photographs of both Tucker and Scott from the photographic line-ups, later admitted to Detective King that he feared retaliation.

(Lodgment 7 at 10-15).

The court of appeal then concluded that this evidence was sufficient to establish that Petitioner was the shooter:

From the foregoing evidence, we conclude that a reasonable trier of fact could find beyond a reasonable doubt that Tucker was supposed to distract Wright while Scott shot him, but that Scott had shot himself as he was pulling the gun out of his pants and, while Scott was stooped over in pain, Tucker took over and fired several shots at Wright as Wright was running away. The jury heard and weighed the conflicting evidence and made a determination about the credibility of the witnesses. Tucker ignores or minimizes the probative value of much of the foregoing body of direct and circumstantial evidence that supports his convictions and the enhancement, and he invites this Court to weigh conflicting evidence and reevaluate the credibility of witnesses. This we cannot and will not do. (*People v. Ochoa, supra*, 6 Cal.4th at p. 1206; *People v. Jones, supra*, 51 Cal.3d at p.314)

12

1

2      (Lodgment 7 at 15.)

3          **3. Analysis**

4          The court of appeal laid out the *Jackson* standard, the clearly established federal law for Petitioner's

5      sufficiency of the evidence claim for his attempted first degree murder and assault convictions and gun use

6      enhancement.  The court of appeal, in evaluating the evidence in the light most favorable to the prosecution,

7      found that a rational juror could determine that Petitioner was the shooter beyond a reasonable doubt.  The

8      court of appeal reached this conclusion based on evidence from the testimony of Wright, Detective King,

9      Detective Keene, Detective Pendleton, Officer Cortez, Scott, Wright's mother, and Wright's father.  Wright

10     testified that Petitioner, who the defense stipulated was a member of the Lincoln Park gang, was in a group

11     of males who he overheard discussing "cleaning up the set" which was meant to mean cleaning up Lincoln

12     Park.  Officer Cortez testified that Wright's father told him at the crime scene that Wright had told him at

13     the hospital that each of the two men who approached him at the apartment complex had a gun in his

14     waistband and that Petition shot him.  Furthermore, Wright's father and mother, Detective King, and

15     Detective Pendleton, testified about the reluctance of witnesses in gang related cases to identify those who

16     have committed a crime because of their fear of retaliation.  Scott's testimony also evidenced that Scott had

17     shot himself in the buttocks and was in a stooped position immediately before Wright was shot and  that

18     Wright was only a few steps away from Petitioner when he was shot.  Finally, Detective King's testimony

19     shows that Wright selected photographs of both Petitioner and Scott from a photographic line-up, but later

20     admitted that he feared retaliation.  Based on this testimony, this Court finds that the court of appeal

21     reasonably applied *Jackson* to conclude that a reasonable trier of fact could find beyond a reasonable doubt

22     that while Scott was stooped over in pain, Petitioner took several shots at Wright as Wright was running

23     away.

24         The court of appeal correctly identified the governing standard under clearly established federal law,

25     and reasonably applied it to find that sufficient evidence supported Petitioner's attempted first degree

26     murder and assault convictions and gun use enhancement.  Accordingly, this Court finds the court of

27     appeal's decision was not contrary to or an unreasonably application of federal law.  Petitioner's ground one

28     is therefore **DENIED**.

**B. Ground Two – Sufficiency of the Evidence: First Degree Murder**

Petitioner's second ground for relief contends that even if he was the shooter, insufficient evidence supports his attempted murder conviction because the evidence was insufficient to establish that Petitioner was the shooter; therefore, the evidence failed to establish premeditation and deliberation. (Doc. No. 4 at 7.) Petitioner provides the same support that he did in ground one–that no witness saw Petitioner with a gun or shoot Wright. (*Id.*)

As in ground one, Respondent argues that claim two does not present a federal question because Petitioner does not assert any federal constitutional violation nor does he cite any federal authority. (Doc. No. 10-1 at 16.)  In the alternative, Respondent contends that to the extent Petitioner states a federal claim, the state court's adjudication was not unreasonable within the meaning of § 2254(d).

Unlike in ground one, Petitioner specifically alleges in his petition that the insufficiency of the evidence supporting his conviction for attempted first degree murder was a violation of his Fourteenth Amendment right to due process.  Therefore, this Court finds Petitioner does state a federal claim and evaluates ground two to determine whether he was denied his right to due process under the Fourteenth Amendment.

**1. Legal Standard**

As discussed in ground one, on federal habeas review of an insufficient evidence claim previously adjudicated by a state court, the applicable, clearly established Supreme Court law for purposes of AEDPA review is the *Jackson* standard, and the federal court may not grant habeas relief unless the state court applied the *Jackson* standard in an "objectively unreasonable" manner.  *McDaniel*, 130 S.Ct. at 673.

**2. Court of Appeal Opinion**

Petitioner's claim of insufficient evidence was considered and rejected by the California Court of Appeal on direct review.  (Lodgment 7 at 15-20.)  The court of appeal began its discussion of Petitioner's claim by defining the offense of attempted murder, quoting California Penal Code sections 21(a), 187(a), and 189:

"An attempt to commit a crime consists of two elements: a specific intent to commit

the crime, and a direct but ineffectual act done toward its commission." (§ [21]a[1]; *see also People v. Swain* (1996) 12 Cal.4th 593, 604-605.)

Section 187, subdivision (a) provides: "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." Section 189 provides in part: "All murder which is perpetrated by means of . . . willful, deliberate, and premeditated killing . . . is murder of the first degree." That section also provides that "[t]o prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his of her act."

(Lodgment 7 at 15-16.)

There are two relevant elements here: (1) whether Petitioner had the specific intent to kill Wright; and (2) whether his actions were premeditated and deliberate. The court of appeal found sufficient evidence as to each issue.

First, the court of appeal identified the evidence on which a rational juror, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that Petitioner had intended to kill Wright:

We reject Tucker's assertion that the prosecution failed to establish by any credible evidence that he had the specific intent to kill Wright. The record contains substantial evidence from which a rational trier of fact could find beyond a reasonable doubt that Tucker intended to kill Wright. As already discussed, substantial evidence shows that he armed himself with a handgun when he went with Scott to the Bay Vista Apartments. Detective Keene testified that Wright told him he turned and ran when he saw the first male–who the record shows was Tucker–raise his gun in Wright's direction. Wright indicated at trial that he started to run because he felt Tucker was trying to "get" him. Wright also testified that as he ran in front of Tucker, who was only a few steps away, he heard a "pow" noise and felt a bullet hit him in the back. As already discussed, the act of firing a gun toward a victim at a close range in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill. (*People v. Chinchilla, supra*, 52 Cal.App.4th at p.690.)

(Lodgment 7 at 17-18.)

Next, the court of appeal then discussed the evidence on which a rational juror could have found that Petitioner shot at Wright with premeditation and deliberation:

Here as, to prior planning activity, Wright testified he recognized both Tucker and Scott among the males in the group who Wright had overheard discussing "cleaning up the set" before the shooting. As already discussed, the testimony of Detectives King and Keene shows that Wright told the officers that Tucker was carrying a gun when he first approached

---

[1]     The California Court of Appeal erred by stating that attempt to commit a crime was defined by section 12(a).

Wright near the stairs. A jury could also reasonably infer from Wright's testimony that Tucker and Scott had been waiting in the dark for him to return to his apartment. After Scott shot himself and was stooped over in pain, Tucker took matters into his own hands and fired several shots at Wright as Wright was running for his life. Tucker's conduct shows he reflected before he acted.

There was also evidence of motive. The gangs involved in this case were rivals. Wright indicated that the Lincoln Park gang claimed Lincoln Park–the area in which the Bay Vista Apartments are located as their territory. He also testified that his brother had been a member of the rival O'Farrell Park gang. Tucker was a documented member of the Lincoln Park gang. A reasonable trier of fact could infer Tucker had a motive to shoot Wright because Wright's family was associated with a rival gang.

The manner of shooting also supports a finding of premeditation and deliberation. Tucker's acts of arming himself with a concealed and loaded handgun and firing shots at a vital area of Wright's body at close range after Scott "bungled" the plan by shooting himself suffice to support a finding of premeditation and deliberation. (*See People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082.) When Scott incapacitated himself, Tucker could have abandoned the plan and left the apartment complex. He chose instead to fire his gun at Wright at close range.

(Lodgment 7 at 19-20.)

Finally, the court of appeal concluded by stating that there was sufficient evidence to support intent, premeditation and deliberation: "Viewing the evidence in the light most favorable to the judgment[2], we conclude there was sufficient evidence from which any rational trier of fact could reasonably find beyond a reasonable doubt that Tucker acted with intent to kill, premeditation, and deliberation." (*Id.* at 20.)

**b. Analysis**

While the court of appeal did not lay out a legal standard in its discussion of this ground, it is apparent that it used the legal standard articulated in its discussion of ground one, discussed above. (Lodgment 7 at 8, 15.)  The legal standard the court of appeal applied is equivalent to *Jackson*, as the court of appeal viewed the evidence in a light most favorable to the prosecution to determine whether it disclosed evidence such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.  The court of appeal also identified essential elements of the offense in question, namely whether Petitioner had the specific intent to kill Wright and whether his actions were premeditated and deliberate. The court of appeal then found sufficient evidence on which a rational trier of fact could find each element

---

[2]   On an insufficiency of the evidence claim, the California standard of appellate review views the "evidence in the light most favorable to the judgment." *People v. Mosher*, 1 Cal.3d 379, 395 (1969).  This standard of review is plainly consistent with the federal *Jackson* standard which views the "evidence in the light most favorable to the prosecution." *See People v. Johnson*, 26 Cal.3d 557, 575 (1980).

beyond a reasonable doubt under the *Jackson* standard.

As in ground one, the issue before the Court is whether the court of appeals applied the *Jackson* standard in an objectively reasonable manner. This Court finds that the court of appeals did apply the *Jackson* standard in an objectively reasonable manner by concluding that there was sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that Petitioner had the specific intent to kill Wright and that Petitioner's actions were premeditated and deliberate. First, there was ample evidence from which a rational trier of fact could find that Petitioner intended to kill Wright. For example, Detective Keene testified that Petitioner pointed the gun in Wright's direction and Wright testified that as he ran in front of Petitioner, he heard the sounds of shot and was hit in the back. Thus, the court of appeal reasonably concluded that there was sufficient evidence to support a reasonable inference that Petitioner fired the gun intentionally.

The second element of the offense in question was whether Petitioner acted with premeditation and deliberation. Petitioner once again contends that he "was never seen with a gun and or seen by any witness (including Wright) as being the shooter." (Doc. No. 4 at 7.) However, as established in ground one, there was abundant evidence to support the conclusion that Petitioner was the shooter.

Petitioner does not allege any other facts to support his contention. Notwithstanding, the court of appeal identified evidence which would support the conclusion that Petitioner acted with premeditation and deliberation. First, the court of appeal identified evidence as to prior planning activity. The evidence that Wright testified that he recognized Petitioner in a group of males discussing "cleaning up the set" before the shooting and the testimony of Detective King and Keene that Wright told the officers that Petitioner was carrying a gun when he first approached Wright near the stairs, supports an inference that Tucker reflected before he acted. The court of appeal also noted the evidence that Tucker was a documented member of the Lincoln Park gang and Wright's brother was a member of a rival gang, which supports the conclusion that a reasonable trier of fact could infer that Petitioner had a motive to shoot Wright. Finally, the court of appeal found the evidence that Petitioner armed himself with a concealed and loaded handgun and fired shots at a vital area of Wright's body at close range supported the conclusion that Petitioner acted with premeditation and deliberation. In light of this body of evidence, this Court finds that the court of appeal

1   reasonably applied *Jackson* in concluding that sufficient evidence existed from which a rational trier of fact

2   could find Petitioner acted with premeditation and deliberation.

3       This Court finds the court of appeal applied the correct governing standard and reasonably applied

4   it to find that sufficient evidence supported Petitioner's convictions for attempted first degree murder.

5   Accordingly, this Court finds the court of appeal's denial of this claim was not contrary to or an

6   unreasonable application of federal law.  Petitioner's ground two is therefore **DENIED**.

7   **C. Ground Three – Implied Waiver of Miranda Rights**

8

9       Petitioner's third ground for relief contends that the trial court erred in finding an implied waiver

10  following an abbreviated *Miranda* advisement in violation of his Fifth and Fourteenth Amendment rights

11  because he was not asked whether he would waive his *Miranda* rights.  (Doc. No. 4 at 8); *Miranda v.*

12  *Arizona*, 384 U.S. 436 (1996).  Respondent asserts that Tucker implicitly waived his *Miranda* rights and

13  voluntarily agreed to discuss the case with the investigators, and therefore the state court's ruling is entitled

14  to deference.  (Doc. No. 10-1 at 18.)

15      **1.  Legal Standard – Implied Waiver of Miranda Rights**

16      Petitioner's claim that the trial court erred in finding that he implicitly waived his *Miranda* rights

17  was denied by the California Supreme Court without a comment and therefore this Court looks through to

18  the decision on the merits by the California Court of Appeal.  *Ylst*, 501 U.S. at 801-06.  Under AEDPA's

19  highly deferential standard of review, this Court evaluates the court of appeal's decision to see if the

20  decision was contrary to or an unreasonable application of clearly established federal law.  28 U.S.C. §

21  2254(d)(1); *Matylinsky v. Budge*, 577 F.3d 1083, 1274-75 (9th Cir. 2009) (applying 28 U.S.C. § 2254(d)(1)

22  to federal habeas review of state court's determination of an implied waiver of *Miranda* rights claim).

23      On federal habeas review of an implied waiver of *Miranda* rights claim previously adjudicated by

24  a state court, the applicable clearly established Supreme Court law for purposes of AEDPA review is the

25  standard articulated in *Miranda v. Arizona*.  *Carey v. Musladin*, 549 U.S. 70, 74 (2006).  In *Miranda v.*

26  *Arizona*, the Supreme Court held that a suspect subject to custodial interrogation must be informed in clear

27  and unequivocal terms that he has the right to remain silent.  *Miranda*, 384 U.S. at 467-68.  To protect the

28  Fifth Amendment privilege against self-incrimination, a suspect must also be informed of the right to consult

10cv2272BGS

with an attorney and to have counsel present during questioning. *Id.* at 469-73. The police must explain this right to him before questioning begins. *Id.* A defendant may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly, and intelligently." *Id.* at 444. "[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Id.* at 475. However, in some cases, "waiver can be clearly inferred from the actions and words of the person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

To determine whether a *Miranda* waiver is voluntary, knowing and intelligently made, courts must examine the totality of the circumstances. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Moreover, "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case." *Butler*, 441 U.S. at 375-76. Instead, a suspect may be found to have waived his *Miranda* rights by answering an officer's questions after receiving *Miranda* warnings. *Terrovona v. Kincheloe*, 912 F.2d 1176, 1179-80 (9th Cir. 1990). Therefore, the question of waiver must be determined on the "particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Butler*, 441 U.S. at 374-75 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

Under AEDPA, the issue this Court faces is whether the state appellate court reasonably applied *Miranda* to the facts of this case. 28 U.S.C. § 2254(d)(1).

### 2. Court of Appeal Opinion

Petitioner's claim that the trial court erred in finding an implied waiver of his rights under *Miranda* was considered and rejected by the California Court of Appeal on direct review. (Lodgment 7 at 20-24.) The court of appeal articulated the legal standard for its review of this claim as follows:

> *Miranda* held that a defendant who is in custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra*, 384 U.S. at p. 479.)
>
> These rights may be waived, so long as the waiver is voluntary, knowing and intelligent. *(Miranda, supra*, 384 U.S. at p. 444.) There are two dimensions to the waiver: "'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.

1

> Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" (*People v. Clark* (1993) 5 Cal.4th 950, 986 (*Clark*).)

2

3

4

(Lodgment 7 at 21-22.)

5

6

The court of appeal began its discussion of Petitioner's claim by establishing the background facts surrounding Detective Keene advising Petitioner of his *Miranda* rights and Petitioner's subsequent actions indicating an implied waiver of his *Miranda* rights:

7

8

9

> Following Tucker's arrest, Detectives Keene and Christine interrogated him after Detective Keene properly advised him of his *Miranda* rights and Tucker indicated he understood those rights.  Detective Keene never expressly asked Tucker whether he waived those rights and wished to speak.  Tucker proceeded to speak with the detectives immediately after he indicated he understood his *Miranda* rights.

10

11

> During the interrogation, which was videotaped, Tucker gave what he characterizes on appeal as "conflicting responses and statements which later proved to be unreliable."  The transcript of the interrogation indicates that the detectives confronted Tucker with the fact that he had been identified as the shooter, and they asked him what he knew about the shooting and gave him an opportunity to give his side of the story.

12

13

14

(Lodgment 7 at 20-21.)

15

16

The court of appeal rejected Petitioner's contention that the trial court erred in finding an implied waiver of his *Miranda* rights.  It explained that "the totality of the circumstances surrounding the interrogation reveals that Tucker understood his *Miranda* rights and made an informed and uncoerced choice to answer the detectives' questions." (Lodgment 7 at 24.)  In support of this conclusion the court of appeal reasoned that the "transcript of the videotaped interrogation shows that Tucker immediately began to answer the detectives' questions after he indicated he understood his *Miranda* rights." (*Id.*)  Furthermore, the court of appeal noted that during the interview Petitioner did not attempt to invoke his *Miranda* rights, stop the interview, or indicate that he had not understood something.  (*Id.*)  Finally, the court of appeal noted that the tone of questioning as evidenced in the transcript (Lodgment 2) was not "particularly harsh or accusatory." (Lodgment 7 at 24.)

17

18

19

20

21

22

23

24

25

26

/ / /

27

/ / /

28

20

### 3. Analysis

On federal habeas review, the state court's factual findings are presumed to be correct and a petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *See Miller-El II*, 545 U.S. at 240.  In the instant case, Petitioner did not meet his burden.  Petitioner alleged that the "interrogating officers never asked whether Petitioner would waive his fifth and sixth Amendment rights, and he gave no such waiver."  (Doc. No. 4 at 8.)  However, these facts are consistent with the factual findings of the California Court of Appeal.  Thus, Petitioner did not provide any evidence rebutting the state court's factual findings; rather, he just summarily asserted that he did not knowingly and intelligently waive his *Miranda* rights.  (*Id*.)  Therefore, this Court will adopt the factual finding of the court of appeal because Petitioner failed to present any evidence to the contrary.

In using these facts, the issue before the Court is whether the state court of appeals laid out the correct standard of clearly established federal law and whether its application was unreasonable in light of the facts. The court of appeal laid out the correct standard for implied waiver of *Miranda* rights.  The court of appeal's determination that Petitioner waived his *Miranda* rights was not unreasonable in light of the evidence presented.  Although the detectives questioning Petitioner did not explicitly ask him if he wished to waive his *Miranda* rights, the court of appeal found Petitioner did indicate he understood those rights.  The state court's conclusion that Petitioner waived his *Miranda* rights is also bolstered by the fact that he proceeded to speak with the detectives immediately after he indicated he understood his *Miranda* rights.  Accordingly, this Court finds the state court of appeal's decision was not contrary to or an unreasonable application of federal law.  Petitioner's ground three is therefore **DENIED**.

### 4. Petitioner's Request for an Evidentiary Hearing

In Petitioner's claim for state court error in finding of an implied waiver of *Miranda* rights, Petitioner argues that he is entitled to an evidentiary hearing.  (Doc. No. 4 at 8).  He states that an "evidentiary hearing is required to develop the facts, since the state court failed to do so."  (*Id*.)

Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999).  The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

(A) the claim relies on –

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2) (West 2006).

In order to determine whether to grant an evidentiary hearing, the court must first "determine whether a factual basis exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078). If not, and an evidentiary hearing would otherwise be appropriate, the court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'" *Id.* at 669-70. A failure to develop the factual basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *See Williams v. Taylor*, 529 U.S. 420, 432 (2000). The Supreme Court has said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

As set forth above, sufficient factual basis exists in the records before the Court to resolve the merits of Petitioner's claim regarding his *Miranda* rights. *See Insyxiengmay*, 403 F.3d at 669-70. Petitioner has not alleged any facts rebutting the state court's factual findings and actually alleges facts consistent with the state court's findings. The state court's decision based upon these facts was not contrary to or an unreasonable application of federal law. Instead of alleging facts that, if proven, would entitle him to habeas relief, Petitioner summarily asserts that he did not waive his *Miranda* rights. (Doc. No. 4 at 8). Accordingly, this Court finds that Petitioner is not entitled to an evidentiary hearing and **DENIES** this request.

///

22

**D. Grounds Four and Five – Ineffective Assistance of Counsel**

Petitioner contends in his fourth and fifth grounds for relief that his trial counsel was ineffective because she (1) failed to elicit evidence that Wright only identified him as the assailant after his mother told Wright that the assailant had "nice" (straight or processed) hair, a description that only his photo met; (2) failed to thoroughly cross-examine Wright or Wright's mother regarding the photo line-ups; (3) failed to seek exclusion of Wright's in court identification of him as the shooter; (4)  failed to cross examine Wright's father regarding inconsistent statements that he made to law enforcement officials; and (5) failed to have the bullets that were recovered from the crime scene tested to prove that they were fired from the same gun (i.e. Scott's).  (Doc. No. 4 at 9, 13; Doc. No. 25 at 1-2.)  Respondent asserts that Petitioner lacks factual support for his claims and therefore the state courts' denial of these claims was a reasonable application of federal law.  (Doc. No. 10-1 at 24-25.)

**1.  Legal Standard – Ineffective Assistance of Counsel**

The California Court of Appeal and Superior Court denied claims for ineffective assistance of counsel that are identical to those alleged in the instant petition and supplemental traverse.  (Lodgments 11 & 15.) Therefore, this Court will look through to the decision from the court of appeal, as it is the last reasoned decision pertaining to Petitioner's fourth and fifth grounds for relief.  *Ylst*, 501 U.S. at 801-06 (1991).  Under AEDPA's highly deferential standard of review, this Court evaluates the court of appeal's decision to see if the decision was contrary to or an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 131 S.Ct 770, 785-86 (2011) (applying 28 U.S.C. § 2254(d)(1) to federal habeas review of state court's determination of an ineffective assistance of counsel claim).

On federal habeas review of an ineffective assistance of counsel claim previously adjudicated by a state court, the applicable clearly established Supreme Court law for purposes of AEDPA review is the standard articulated in *Strickland v. Washington*.  *Richter*, 131 S.Ct 770 at 778.  As articulated in *Strickland*, the Sixth Amendment guarantees the effective assistance of counsel at trial.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) the counsel's performance was deficient, and (2) that the deficient performance prejudiced petitioner's defense.  *Id*. at 688.

23

To prevail, the claimant must demonstrate that counsel failed to exercise reasonable professional judgment and resulting prejudice. *Id.* at 694. First, the petitioner must show that counsel's performance was deficient, which requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id.* at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. *Id.* at 688. There is a strong presumption that counsel's conduct fell within the broad range of reasonable professional assistance. *Id.* at 690.

Second, the petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see Richter*, 131 S.Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable"). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 791-92 (reversing a Ninth Circuit *en banc* grant of habeas relief on an ineffective assistance claim for lack of sufficient deference to a state court result).

As the Supreme Court reaffirmed in *Harrington v. Richter*, meeting the standard for ineffective assistance of counsel in federal habeas is extremely difficult:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." [citation omitted]. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 131 S.Ct 770, 785-86.

Thus, when a state court has rejected an ineffective assistance of counsel claim, as it has in this case, a federal habeas court's review is "doubly deferential" under AEDPA. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). Accordingly, even if a petitioner presents a strong case of ineffective assistance of counsel, this Court may only grant relief if "no fairminded jurist could agree on the correctness of the state court's decision." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

### 2. Court of Appeal Opinion

On Petitioner's state habeas petition, the court of appeal, in addressing Petitioner's allegations as to why he is entitled to relief for ineffective assistance of counsel, articulated the legal standard for its review of ineffective assistance of counsel as follows:

> A criminal defendant is entitled to the effective assistance of counsel; however, in seeking to set aside his convictions, he bears the burden to demonstrate that the assistance given was deficient (that is, it fell below an objective standard of reasonableness under prevailing professional norms), and that it was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 686, 693-694; *In re Sixto* (1989) 48 Cal.3d 1247, 1257.) In reviewing a challenge to the competency of counsel's conduct, we must defer to counsel's reasonable tactical decisions and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) Where the record does not establish the reasons underlying that conduct, ineffective assistance is established only if there is no conceivable reason for the challenged acts or omission. (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

(Lodgment 15 at 2.)

The court of appeal then applied the standard articulated in *Strickland* to the facts of Petitioner's case:

> Here, Tucker has not met his burden to establish either deficient performance by his attorneys or prejudice. For example, the limited record before us (consisting of the partial transcript of Wright's cross-examination and transcripts of Wright's mother's cross-examination and counsel's closing arguments) does not include (a) evidence that Wright's mother made any statement to Wright about the suspect having "nice" hair, (b) evidence establishing unequivocally that Wright identified him only in the second photo line-up (compare *People v. Tucker*, *supra*, at p.7 [indicating that Wright did identify Tucker in the first photo line-up as possibly having been involved]) or (c) Wright's in-court identification of him as the perpetrator.
>
> Moreover the record establishes that Wright's trial counsel did cross-examine Wright and each of his parents on the matters that Tucker asserts were not adequately covered and Tucker fails to identify how those cross-examinations were deficient. In addition, we cannot determine from the existing record that there was no tactical basis for trial counsel's failure to inquire further into these areas.
>
> Similarly, Tucker's assertion that trial counsel was ineffective in failing to have the bullet fragments found at the scene tested is also unsupported by the record, which is completely silent on what defense counsel may have known or relied upon as a basis for deciding not to pursue such an investigation. (See *People v. Freeman* (1994) 8 Cal.4th 450, 509 [Recognizing that competent counsel "is not required to make all conceivable motions or to leave an exhaustive paper trail for the sake of the record" but rather is to "realistically examine the case, the evidence, and the issues, and pursue those avenues of defense that, to their best and reasonable processional judgment seem appropriate under the circumstances.].)

(Lodgment 15 at 2-3.)

The court of appeal concluded that Petitioner's attorney was competent and thus denied the petition.

10cv2272BGS

(Lodgment 15 at 3.)

**3. Analysis**

The issue before the court is whether "no fair minded jurist could agree on the correctness of the state court's decision." *Yarborough*, 541 U.S. 652 at 644. In evaluating the correctness of the state court's decision, this Court will look to the court of appeal's decision to see if the decision was contrary to or an unreasonable application of clearly established federal law. First, the court of appeal was correct in laying out the *Strickland* standard for reviewing Petitioner's claims of ineffective assistance of counsel. Second, the court of appeal reasonably applied the *Strickland* standard to the facts of the case. As established above, the court of appeal determined that Petitioner's five contentions supporting his claim for ineffective assistance of counsel were not supported by the record. In reviewing the record, the court of appeal found there was no evidence supporting Petitioner's claims regarding Wright's identification of Petitioner, trial counsel did cross-examine Wright and each of his parents on the matters Petitioner asserts were not fully covered, and there was nothing in the record to support Petitioner's assertion about the bullet fragments. Furthermore, Petitioner does not provide any additional evidence in his Petition to support these five contentions. Rather, he just summarily asserts the identical five unsupported contentions from his petitions for writs of habeas corpus in the trial court and court of appeal. (Lodgment 11 & 15.) Therefore, this Court finds the state court reasonably concluded Petitioner failed to meet his burden for prevailing on a claim of ineffective assistance of counsel. Thus, this Court does not find that "no fair minded jurist could agree on the correctness of the state court's decision." *Yarborough*, 541 U.S. 652 at 644. Accordingly, this Court finds the state court of appeal's decision was not contrary to or an unreasonable application of federal law. The Court **DENIES** grounds four and five.

///

///

///

///

///

10cv2272BGS

**IV. Conclusion and Recommendation**

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** and Petitioner's request for an evidentiary hearing is **DENIED**.

A certificate of appealability will not issue.  *See* 28 U.S.C. §2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

DATED: June 12, 2012

_____
**BERNARD G. SKOMAL**
United States Magistrate Judge

10cv2272BGS